637 So.2d 270 (1994)
CONTINENTAL CASUALTY COMPANY, Appellant,
v.
UNITED PACIFIC INSURANCE COMPANY, a Washington corporation, Appellee.
No. 93-1076.
District Court of Appeal of Florida, Fifth District.
April 22, 1994.
Certification Denied May 31, 1994.
Susan B. Collingwood and Laura Jacobs of Fisher, Rushmer, Werrenrath, Keiner, Wack & Dickson, P.A., Orlando, for appellant.
Ted R. Manry, III and H. Vance Smith of MacFarlane Ferguson, Tampa, for appellee.
EN BANC
GRIFFIN, Judge.
Continental Casualty Company ["Continental"] appeals a summary final judgment in favor of United Pacific Insurance Company *271 ["United"] in a subrogation action. Continental seeks to recover from United attorney's fees and costs it expended in defending its mutual insured. Continental acknowledges that the prevailing case law in Florida, to which we subscribed in MacLeod v. School Board of Seminole County, 490 So.2d 230 (Fla. 5th DCA 1986), does not allow such a recovery. We have been asked to reconsider our prior decision and adopt a new rule allowing such a recovery on the theory of equitable subrogation. We have considered this case en banc and have determined to decline Continental's invitation. Accordingly, we affirm.
In 1987, Nieves Guerrero commenced a lawsuit. The defendants were Ponce de Leon Building Associates ["Ponce de Leon"] and the Allen Morris Management Company ["Allen Morris"]. It is unclear from the limited record below when Allen Morris became a party. Continental had issued a liability insurance policy to Ponce de Leon, pursuant to which Allen Morris was an additional insured. Continental defended Ponce de Leon and, since at least June 1990, had provided Allen Morris a defense as required by its policy.[1] In April 1991, Continental learned that Allen Morris also had a policy of liability insurance issued by United. Interestingly, Continental filed answers to interrogatories below in which it alleged that Allen Morris impeded Continental's efforts to discover United's coverage. Both the Continental and United policies provided primary coverage for the Guerrero claim. On April 23, 1991, Continental notified United of the lawsuit and informed United that Continental would look to United for "contribution involving the cost of the defense" of the claim as well as any verdict against Allen Morris. A United adjuster was kept informed of the progress of the lawsuit, and a settlement was negotiated later in 1991, with United's participation. Continental and United contributed equally to the settlement amount but, consistent with prevailing Florida law, United refused to reimburse Continental for any part of the cost of defending the suit.
On April 7, 1992, Continental filed this action against United to recover half of the expenses, costs, and attorney's fees it incurred in the defense of the Guerrero claim on the theory of "equitable subrogation." Continental alleged that United owed Allen Morris payment of defense costs, which Continental was entitled to recover because it had incurred these defense expenses on Allen Morris' behalf. Equitable subrogation was the only recovery theory pleaded.
United filed a motion for summary judgment asserting that Continental was not entitled to such recovery pursuant to Argonaut Insurance Co. v. Maryland Casualty Co., 372 So.2d 960 (Fla. 3d DCA 1979). As in this case, Argonaut was an action by one insurer against another insurer to recover a pro-rata share of attorneys' fees incurred in providing a defense to the companies' mutual insured in a prior lawsuit. The Argonaut court rejected Argonaut's claim, finding no contractual or quasi-contractual duty and no basis to apply the doctrine of equitable subrogation. The Third District held that the duty of each insurer to defend its insured is personal and does not inure to the benefit of another insurer.
The Argonaut court quoted extensively from a 1955 California case whose explanation of the issue merits reiteration:
While the fact that here both companies in their policies agree to defend the assured bears some analogy to the situation where both companies have agreed to indemnify the assured against a total loss, nevertheless the agreement to defend is not only completely independent of and severable from the indemnity provision of the policy, but is completely different. Indemnity contemplates merely the payment of money. The agreement to defend contemplates the rendering of services. The insurer must investigate, and conduct defense, and may if it deems it expedient, negotiate and make a settlement of the suit. These matters each insurer is required to do regardless of what the other insurer is doing. While both may join together in the services and share expenses, *272 there is no requirement that they do so. Conceivably, one might disagree with the other as to the strategy of the investigation and defense. It could act independently of the other. Thus the relationship is more that of coinsurer than cosurety. As to the assured, neither one is excused to any extent from its full duty to defend, no matter what the other does. The duty to defend is personal to the particular insurer. It is not entitled to divide that duty with or require contribution from the other.
372 So.2d at 963, quoting Financial Indemnity Co. v. Colonial Insurance Co., 281 P.2d 883 (Cal.Ct.App. 1955).[2]
The Argonaut court also rejected the argument that an equitable right to subrogation should be created in order to discourage insurers from shirking their duty to defend:
If an insurance company refuses to defend or provide contractual coverage to its insured, then it may expose its policy limits to a third party and faces a breach of contract suit with other statutory remedies (e.g., Section 627.421(1), Florida Statutes) by the insured. An insured is adequately protected when its insurer breaches its contract. Further, third parties are protected for required liability coverage by public policy pursuant to established law. All necessary remedies and protection to the proper parties are available to enforce all necessary rights.
* * * * * *
The Legislature has not seen fit to allow contribution for costs or attorney's fees between insurance companies. If contribution for costs were allowed between insurance companies, there would be multiple claims and law suits. The insurance companies would have no incentive to settle and protect the interest of the insured, since another law suit would be forthcoming to resolve the coverage dispute between the insurance companies. This is contrary to public policy, particularly since the insured has been afforded legal protection and has not had to personally pay any attorney's fees.
372 So.2d at 964 (emphasis in original). Argonaut was correct that traditional principles of subrogation will not support a reimbursement of defense costs in favor of someone who has the independent contractual duty to pay all such expenses. Indeed, Continental has acknowledged in its brief that a "traditional," "rule-bound" application of subrogation would not provide a basis for recovery.[3] We find no basis to quarrel with Argonaut or withdraw our prior approval of the decision expressed in MacLeod[4] and, accordingly, we affirm the summary judgment rendered in favor of United.
We acknowledge that there is a substantial divergence of views on this issue and that the trend may be contrary.[5] The courts of several states, both before and after Argonaut, have concluded that the duty to contribute should be imposed on a non-defending insurer and have simply created a remedy. Some courts have called it "equitable subrogation," but most cases speak of "contribution." As noted by Judge Sharp in her opinion, at least one commentator has referred to the case law denying contribution as being "indefensible." 7C Appleman, Insurance Law & Practice § 4691 at 278 (1979). The justification offered for the creation of this duty is one of "public policy;" courts have theorized that *273 the imposition of a duty to contribute to the cost of defense will discourage insurers who are "not concerned with their obligations to their insureds" from "lagging behind" and "shirking" their duty to defend in the hope that the other primary insurer will defend and relieve them of the expense.[6]
We begin by refusing simply to assume the premise on which the public policy rationale for creating a right of contribution has been based. Continental contends broadly that, without the creation of this rule, insurers will seek with impunity to evade their responsibility to defend their Florida insureds. No evidence was offered below, however, that Florida's current rule disallowing contribution has led to "shirking," "lagging behind" or "bad faith" on the part of insurers.[7] Presumably, Continental, one of the most prominent liability insurers in Florida, would deny it has ever been induced to act in such a manner. Several factors discourage such misconduct, including exposure to greater loss if the other insurer is ineffective in its defense, and the risk of suits by its own insured on theories of breach of contract and statutory and common law "bad faith." It is important to keep in mind that insurers have not only the duty to defend but often contractually reserve the right to defend. Insurers know the ability to control the defense of a liability case is the most effective way to limit their loss and protect themselves from extra-contractual claims.
In fact, the collective experience of this court suggests these dual inducements are usually sufficient to impel Florida insurers to meet their contractual duty to provide a defense in multiple coverage cases, even without the threat of contribution. As a practical matter, this happens in a variety of ways, depending on the circumstances. Sometimes carriers will agree to select an attorney who is on the "approved" list for each carrier and will split defense costs. Sometimes both carriers will hire counsel and provide legal representation, but with the understanding that the attorney hired by the carrier with the highest exposure will be lead counsel, assisted by the other. Sometimes, the defense functions are simply divided to save expenses and duplication of effort. There may be some instances where one carrier takes the "lag behind" strategy; however, we find it significant that in the fifteen years since Argonaut was decided in the Third District, there has been virtually no activity on this issue out of the other districts. Nor has any fact pattern arisen that would cause the courts that have decided this issue to reconsider. The facts of this case do not.
The evidence in the record below shows that United was not put on notice of a claim covered under its policy until the suit had been pending over four years and its insured had been defended by Continental for at least a year. Presumably, when put on notice, United could have raised substantial coverage defenses, including late notice, lack of cooperation, or prejudice due to its previous inability to participate in or direct the defense. United elected, instead, to acknowledge its duty of indemnity. The amount of its overall exposure, including defense costs, may have been a factor in that decision. It does not appear that United needed to step in to protect its insured due to any deficiency in the defense being provided by Continental. Moreover, the record suggests this was a small, uncomplicated case that likely did not warrant the addition of a second set of lawyers. Significantly, neither Continental nor the insured ever asked United to provide a *274 defense. Continental simply informed United that it expected United to help pay Continental's lawyers. In fact, according to Continental's proof, Allen Morris did not want United to participate.
As should always be the case when a court tinkers with long-established legal principles such as subrogation or contribution, on grounds of "public policy," the consequences of such an action should be considered. We have attempted to do so by looking at developing case law in jurisdictions where this right of contribution between insurers has been recognized. The case law does not inspire confidence that the alternative policy is superior.
A recent Idaho case, Aetna Casualty & Surety Co. v. Mutual of Enumclaw Insurance Co., 826 P.2d 1315 (Idaho 1992) resolved an issue bound to arise in this context. There the insured put both carriers on notice, both carriers determined that a potential for coverage under their policy existed, and both carriers provided a defense. One carrier, however, apparently did more defending and incurred substantially more defense expense than did the other. The carrier contributing the lion's share to the cost of defense sought contribution against the other, seeking to recover one-half of its outlay. The Idaho court, implicitly recognizing that the right of contribution between insurers arises out of a public policy determination that contribution is a form of punishment for an insurer's breach of its duty to defend, ruled that because the second carrier had not breached its duty to defend, no right of contribution was available. It is questionable whether courts have accomplished any great public policy goals by encouraging insurers in multiple coverage cases to defend, but permitting them to defend as little as possible in hopes another carrier will pick up the slack. This seems to be just another, more subtle form of "lagging behind." That is not to say that we are critical of the result reached in Aetna Casualty.[8] Certainly, the result reached is more logical than what Aetna urged, which would create a right of contribution between defending insurers and would require a trial on the reasonableness and necessity of the fees each carrier had incurred.
Another problem that arises where contribution is allowed is well illustrated by the recent case of Institute of London Underwriters v. Hartford Fire Insurance Co., 234 Ill. App.3d 70, 175 Ill.Dec. 297, 599 N.E.2d 1311 (1992). As stated by the Illinois court, the issue was the following: where two insurance policies potentially apply to a loss, may an insured elect which of its insurers is to defend and indemnify the claim by tendering its defense to one insurer and not the other and thereby foreclose the settling insurer from obtaining contribution from the non-settling insurer? 175 Ill.Dec. at 299, 599 N.E.2d at 1313. The court's answer was "yes."
Institute of London Underwriters involved a claim against the Great Lakes Towing Company arising out of an accident during repairs on its property. Apparently, Great Lakes was covered as the named insured on its own liability policy, and as an "additional insured" on the liability policy issued by Hartford Fire, which wrote the liability coverage on the company Great Lakes had employed to perform the repairs. Great Lakes did not tender the defense of the claim to its own carrier nor did Great Lakes seek indemnification. To the contrary, Great Lakes notified its carrier of the claim but unequivocally instructed its carrier not to respond to the loss. Not surprisingly, Hartford argued that the wishes of the insured were irrelevant because the right to contribution was Hartford's, and notwithstanding the fact that the party who had contracted for and had paid the premium for the other insurance did not want its other carrier involved, Hartford was entitled to enforce "its" rights. The court denied contribution, citing a number of Illinois decisions standing for the proposition that no duty to defend arises and, accordingly, no right of "equitable contribution" exists between insurers unless and until the insured itself "tenders" the defense to both carriers. 175 Ill.Dec. at 299, 599 N.E.2d at 1313.
Finally, the court observed that:

*275 Great Lakes may well have feared that if the loss were attributed to its policy with Hartford, the result might be a rise in premiums or cancellation of its policy. This factor alone suggests the insured ought to have the right to seek or not to seek an insurer's participation in a claim as the insurer chooses when more than one carrier's policy covers the loss.
If the doctrine of equitable contribution is applied to the facts of this case to allow the Institute to recover from Hartford for a claim never tendered by the insured and in which the insured has directed it not to participate, the insurance policy becomes, in effect, a third-party beneficiary contract entered into by the insured for the direct benefit of other carriers.
175 Ill.Dec. at 302, 599 N.E.2d at 1316.[9] Thus, even if contribution were allowed in Florida, under the rationale of Institute of London Underwriters, Continental would not be entitled to claim it in this case.
Another complication that arises in those jurisdictions that require an insured to "tender" the defense to both carriers in order for the right of contribution to arise is the "sophistication" of the insured. Recognizing that the request for a defense by an insured is essential to give rise to the duty on the part of an insurer to defend (and thereby be exposed to contribution for a failure to do so), courts have worried aloud about applying this requirement to an "unsophisticated" insured. Thus, a duty to defend does not arise (and the insurer is not exposed to contribution) if a "sophisticated" insured does not tender the defense but a duty to defend may be found where an "unsophisticated" insured does not tender the defense. See, e.g., Hartford Accident and Indem. Co. v. Gulf Ins. Co., 776 F.2d 1380 (7th Cir.1985); Eastman v. United States, 257 F. Supp. 315 (S.D.Ind. 1966). Obviously, what constitutes "sophistication" and "tender" is fertile ground for litigation.
Another jurisdiction that apparently recognizes the "tender" rule is Maryland. Recently, in Scottsdale Insurance Co. v. American Empire Surplus Lines Insurance Co., 791 F. Supp. 1079 (D.Md. 1992), a federal district court was faced with the question of which fees incurred by the defending insurer are embraced by the duty to contribute. There, as in the present case, the second insurance policy was not discovered until the litigation had been pending some four years. The second carrier was not put on notice until thirty to sixty days before the trial. The Maryland court held that even where there is a right to contribution, the defending insurer can have no right to recover a share of fees and expenses incurred for its defense of the mutual insured prior to the time the other insurer was put on notice of the claim.
Another source of concern is that courts adopting the Appleman approach acknowledge that they are creating an independent action by one insurer against another under principles of equity. National Indemnity Co. v. St. Paul Ins. Cos., 150 Ariz. 492, 724 P.2d 578, 580 (Ct.App. 1985), approved, 150 Ariz. 458, 724 P.2d 544 (1986); Del Grosso v. Casualty Ins. Co., 170 Ill. App.3d 1098, 120 Ill.Dec. 860, 524 N.E.2d 1042 (1988). By creating this right of contribution between insurers, the insured finds itself placed precariously in the middle. It is only a matter of time (if it hasn't happened already) that anything the insured does (or fails to do) that jeopardizes an insurer's contribution "rights" will be the basis of a defense to coverage or even a claim against the insured for interfering with, or failing to protect, these rights.
In sum, it appears to us that the complications arising from the creation of this right of "equitable contribution" or "equitable subrogation" are at least as troublesome as the speculative ill sought to be remedied by the creation of this right in the first place. As the Argonaut court suggested in 1979, the place for this issue to be examined and remedied, if appropriate, is in the legislature.
We conclude by reminding any Florida insurer tempted to breach its duty to defend because Florida courts do not recognize a right of contribution between insurers for defense costs that the linchpin of Florida's rule is the certainty of our courts that "all *276 necessary remedies [for breach of the duty to defend] and protection to the proper parties are available... ." 372 So.2d at 964 (emphasis added). We remain confident that, if it becomes necessary, the remedy found will not only adequately compensate the insured for the loss of the benefit of its bargain but will also meet the public policy goal of discouraging insurer misconduct.
AFFIRMED.
HARRIS, C.J., and DAUKSCH, COBB, GOSHORN, PETERSON and THOMPSON, JJ., concur.
W. SHARP, J., dissents, with opinion.
DIAMANTIS, J., did not participate.
W. SHARP, Judge, dissenting.
I respectfully dissent. There is a trite saying worth repeating in the context of this case: "If it ain't broke, don't fix it." But that can be countered by the more recent "if it ain't broke, break it." Specifically translated in the context of this case, the question is whether the common law of Florida should continue to be that a co-primary liability insurance company has no right to seek from another co-primary insurer, a prorate share of its attorney's fees and costs incurred by it in the defense of a mutual insured pursuant to Argonaut Insurance Co. v. Maryland Casualty Co., 372 So.2d 960 (Fla. 3d DCA 1979). That question should be considered anew at the appellate level because fifteen years have passed since Argonaut, and it has drawn much criticism.
A plausible argument can be made for both sides. Since the majority has determined to stick with Argonaut, I write to present the other point of view. I also urge this case be certified to the Florida Supreme Court as one of great public importance,[1] thereby affording the Florida Supreme Court a chance to consider the rule of law formulated by Argonaut, since there are no other appellate decisions in this state in conflict with Argonaut and the Florida Supreme Court has no "reach-down" discretionary jurisdiction, absent a certification by this court.
In this case, Continental Casualty Company handled the defense of Allen Morris Management Company, the insurance companies' mutual insured. Until Continental's defense undertaking was well underway, no one realized United Pacific Insurance Company was a co-primary liability insurer of Allen. After learning of United's status as a co-primary insurer, Continental notified United about the progress of the lawsuit and consulted with its attorneys.
Continental also notified United that it expected United would contribute a prorate share of the attorney's fees and costs it was incurring in the defense of their mutual insured. United remained silent on that point. United did participate in the settlement of the case against its insured, and paid one-half of the settlement amount.
In Argonaut, our sister court held that a primary insurer could not recover attorney's fees and costs from another primary insurer on the theory of subrogation. The rationale of the court was that each insurer had a separate and independent insurance contract with the insured, and was independently legally bound to defend him. If contribution suits were allowed between insurers, "there would be multiple claims and law suits. The insurance companies would have no incentive to settle and protect the interest of the insured, since another law suit would be forthcoming to resolve the coverage dispute between the insurance companies. This is contrary to public policy, particularly since the insured has been afforded legal protection and has not had to personally pay any attorney's fees." Argonaut, 372 So.2d at 964.
Continental argues that failure to allow equitable subrogation in this context has led to greater disregard of insureds' interests by insurers than would occur if the Argonaut rule were rejected. Under Argonaut, insurers play the game of "chicken," forcing the other equally obligated insurer to undertake the defense first, while flirting around the edges of bad faith breach of their duty to defend. The insurer who is the most responsible and undertakes the defense is penalized by being forced to bear all the costs, expenses *277 and attorney's fees for discharging not only its own contract to defend, but the co-primary insurer's obligation, as well. The insurer who honors its contract to defend its insured, under Argonaut, cannot force the other insurer to pay a prorata portion of its expenses, and the unresponsive insurer is saved from any bad faith suit by its insured, or any other third party, by the diligence and effort of the other insurer.
Continental asserts that this approach rewards the shirkers and lag-behinds. It does not benefit insureds, as a class. Rather, Argonaut has the detrimental effect of not encouraging insurers to fulfill their contractual duties to defend their insureds with alacrity and diligence.
7C Appleman, Insurance Law & Practice § 4691 at 278 (1979) is highly critical of Argonaut and cases reaching a similar conclusion:
These holdings are indefensible. The courts are ignoring realities and encouraging insurers who are not concerned with their obligations to their insureds in the hope that someone else will step into the breach. It also ignores the fact that excess and other insurers are third party beneficiaries under the basic contracts of insurance and should be able to recover, either under a theory of equitable subrogation, contracts or torts, any expenses incurred under the circumstances. Further, as a matter of public policy, courts should be demanding that insurers give prompt defense of claims to policyholders rather than to tolerate the shifting of responsibility with such impunity. And that is the position taken either by statute or by decision in many states. [footnotes omitted]
Other states have rejected the principle adopted in Argonaut and allow an insurance company providing the defense to a mutual insured to recover its costs from another mutual insurer. In National Casualty Co. v. Great Southwest Fire Insurance Co., 833 P.2d 741 (Colo. 1992), the Colorado Supreme Court, sitting en banc, concluded that National was entitled to a prorata contribution from Great Southwest of its defense costs and settlement made on behalf of their mutual insured, a city in Colorado. The court noted that the majority of courts which have considered this issue permit an insurer which voluntarily pays more than its share of a loss to demand contribution from a second insurer. The court pointed out that the effect of the opposite view would be to reward an insurer for refusing to honor its contractual obligations.
In Oregon Automobile Insurance Co. v. State Accident Insurance Fund, 272 Or. 32, 534 P.2d 954 (1975) the Oregon Supreme Court, sitting en banc, held that where two insurance companies each provided the same amount of coverage to their mutual insured, the companies should share the defense costs equally. The court noted that when the amounts of coverage are different, defense costs should be prorated in accordance with the proportion that each insurer's coverage bears to the total coverage. Thus the insurer who stands to bear the greater proportion of the loss will be benefitted the most by a successful defense.
In Marwell Construction, Inc. v. Underwriters at Lloyd's, London, 465 P.2d 298 (Alaska 1970), the Supreme Court of Alaska applied the principle of equitable subrogation and ruled that defense costs must be shared prorata between concurrent insurers in proportion to the amounts of coverage they have provided. The court pointed out that a breach of the obligation to defend should not be encouraged by a rule under which there is "everything to gain and nothing to lose":
Of greater importance are the consequences which would follow from such a rule. The insurer who wrongfully breached its duty to defend would be awarded a bonus for having done so, by having another company bear the entire cost. This would make it attractive for insurance companies to disavow responsibilities, and to find reasons, in the inevitable ambiguity of the fine print of their policies, to deny coverage to the insured. This is contrary to the important principle that the policy should be construed liberally to provide coverage to the insured.
465 P.2d at 313.
In Continental Casualty Co. v. Zurich Insurance Co., 57 Cal.2d 27, 17 Cal. Rptr. 12, *278 366 P.2d 455 (Cal. 1961), the Supreme Court of California, sitting en banc, ruled that under general principles of equitable subrogation as well as the rule that the insurance policy should be liberally construed to provide coverage to the insured, all obligated carriers who have refused to defend should be required to share in the costs of the insured's defense, whether such costs were paid by the insured himself or by fewer than all the carriers. The court held that the fact that the agreement to defend the insured may be severable from the general indemnity provision and that each insured independently owes that duty to its insured, constitute no excuse for any insurer's failure to perform. The court pointed out that the contrary rule would simply provide a premium or offer a possible windfall to the insurer who refuses to defend and who takes a chance that the cost of defense will be provided by some other insurer at no expense to itself. The court concluded that no insurer which deliberately breaches its obligation to the insured should be permitted to profit, whether at the expense of the insured or of an insurer which faithfully discharges its obligation.
In National Indemnity Co. v. St. Paul Insurance Companies, 150 Ariz. 492, 724 P.2d 578 (App.Ct. 1985), the Arizona appeals court held that defense costs should be prorated on the same basis as loss. The court noted that the contrary rule was based on the theory that each insurer has an independent obligation to defend and that, absent an agreement between the insurers, there is no right to contribution for the cost of the defense. However, the court pointed out that this reasoning has been strongly "criticized as being indefensible," citing 7C Appleman, Insurance Law & Practice § 4691 (1979). The court agreed with this criticism concluding that if equity demands that a second insurer contribute to the cost of a settlement, it likewise demands that the second insurer contribute to the cost of defense. In so ruling, the court noted that another division of the appeals court, division two, had held to the contrary. Arizona Joint Underwriting Plan v. Glacier General Assurance Co., 129 Ariz. 351, 631 P.2d 133 (App.Ct. 1981).
In National Indemnity Co. v. St. Paul Insurance Companies, 150 Ariz. 458, 724 P.2d 544 (1986), the Supreme Court of Arizona resolved the conflict between the divisions and approved the ruling in division one. The court held that under the principle of equitable subrogation, an insurer which has performed the duty to provide a defense to its insured should be able to compel contribution for a share of the cost of defense from another insurer who had a similar obligation to the same insured but failed to perform it.
When an insurer has a duty to defend the insured, there should be no reward to the insurer for breaching that duty. A breach of the obligation to defend should not be encouraged, but the rule which allows an insurer to avoid the costs of defense tends to encourage an avoidance of the insurer's responsibilities.
724 P.2d at 545.
In Federal Insurance Co. v. Atlantic National Insurance Co., 25 N.Y.2d 71, 302 N.Y.S.2d 769, 250 N.E.2d 193 (1969), the New York Court of Appeals held that where two insurance policies both contained provisions limiting themselves to excess coverage when there is other available insurance, the excess clauses operated to cancel out each other and both coverages must be treated as primary. Thus each company was obligated to share in the cost of the settlement, legal fees and other expenses of the litigation.
In the federal courts, there is a split of authority on this issue. See Scottsdale Insurance Co. v. American Empire Surplus Lines Ins. Co., 791 F. Supp. 1079, 1085 n. 9 (D.Md. 1992). In Scottsdale Insurance Co., the court was persuaded that the better view is that each insurer should contribute to the cost of the defense because each insurer has a duty to defend. "To hold otherwise would be to reward the insurer who refused to provide a defense for its obduracy." 791 F. Supp. at 1085, n. 9. See also St. Paul Fire & Marine Insurance Co. v. Vigilant Insurance Co., 919 F.2d 235 (4th Cir.1990) (where two insurance companies have a duty to defend the insured, one insurance company was entitled to recover one-half of the cost for defending the insured and the cost of settling the claims from the other insurance company which failed to meet its duty to defend); Continental Insurance Co. v. McKain, 821 F. Supp. 1084 (E.D.Pa. 1993) (same method of prorata apportionment applies to both indemnity costs and defense costs); Liberty Mutual *279 Insurance Co. v. United States Fidelity & Guaranty Insurance Co., 756 F. Supp. 953 (S.D.Miss. 1990) (under Mississippi law, if an insurer breaches a duty to defend and the defense is assumed by second insurer, the second insurer may recover that portion of the reasonable and necessary attorney's fees and settlement payments which the first insurer was obligated to pay); Twin City Fire Insurance Co. v. Home Indemnity Co., 650 F. Supp. 785 (E.D.Pa. 1986) (where two insurance companies had a duty to defend their mutual insured in a law suit, each was liable under Pennsylvania law for one-half of the reasonable costs and expenses incurred in connection with the law suit).
In this case United did not breach its duty to defend Allen since by the time it was notified of the claim against its insured, Continental was already discharging this duty  one it was obligated to perform under its contract with Allen. Nevertheless, United sat quietly by and allowed Continental to finish the job, apparently content with how the defense was being handled. In my view this situation, as well as one where a co-primary insurer actually breaches its duty to defend a mutual insured, should give rise to a prorata claim against United for attorney's fees and costs expended by Continental, at least for those incurred after United was notified about the claim and Continental's continued undertaking to discharge their mutual defense obligation.
NOTES
[1] According to Continental's answers to interrogatories, as of April 23, 1991, it had expended $10,868.19 defending Ponce de Leon and $352.95 defending Allen Morris.
[2] Continental points out that Financial Indemnity was overruled in Continental Casualty Co. v. Zurich Insurance Co., 57 Cal.2d 27, 17 Cal. Rptr. 12, 366 P.2d 455 (1961); however, this event had occurred long before its reasoning was adopted by the Third District. The Third District evidently concluded, as we do, that the reasoning of Zurich is unpersuasive.
[3] The Argonaut court also rejected the argument that the defending insurer can recover the expenditure of fees pursuant to the subrogation clause in its policy. The court explained that such contractual subrogation clauses only allow the insurer to recover payments made by the insurer on behalf of the insured. Providing a defense to the insured is not payment of a loss.
[4] Argonaut was also cited in Marriott Corp. v. Travelers Indemnity Co., 473 So.2d 281 (Fla. 1st DCA 1985), for the proposition that section 627.421 does not authorize the indemnification of attorney's fees from one insurer to another when both have a duty to defend.
[5] E.g., National Casualty Co. v. Great Southwest Fire Ins. Co., 833 P.2d 741 (Colo. 1992).
[6] Appleman, supra. Appleman's second argument, which we simply cannot take seriously (under Florida law, at least) and will not discuss further is that when an insured purchases multiple policies of insurance to cover his risk of loss, these several insurers become third party beneficiaries of all the other policies.
[7] For that matter, a factual basis for the compelling need on the ground of "public policy" is conspicuously absent from many of the prominent cases. Some courts seem to consider it sufficient to cite Appleman. In fact, in the recent case of National Casualty Co. v. Great Southwest Fire Ins. Co., 833 P.2d 741 (Colo. 1992) (en banc), where the supreme court of Colorado decided to adopt contribution, there is no basis to conclude from the underlying facts that the co-insurer's decision not to defend was in any way influenced by its desire to avoid defense costs. Rather, the insurer had a substantial defense relating to whether the claim was within the term of its "claims made" policy at all  a defense which was credited both by the trial court and the intermediate appellate court.
[8] Another interesting feature of the case is that both the insurer and insured were parties plaintiff in the case, seeking recovery of defense costs, punitive damages and attorney's fees.
[9] The Illinois court found no basis in the contract or in Illinois law for a third party beneficiary argument. 175 Ill.Dec. at 302-03, 599 N.E.2d at 1316-17.
[1] Fla.R.App.P. 9.030(a)(2)(A)(v).